NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-213                                        Appeals Court


ALESSENDRINIA MENARD  vs.  ARCHDIOCESE OF BOSTON.[1]


No. 19-P-213.

Norfolk.     April 9, 2020. - July 29, 2020.

Present:  Milkey, Shin, & Englander, JJ.


Anti-Discrimination Law, Age, Sex.  Employment, Discrimination.
    Constitutional Law, Establishment of religion, Freedom of
    religion.  Religion.  Church.  Jurisdiction, Ecclesiastical
    controversy.  Practice, Civil, Motion to dismiss.


Civil action commenced in the Superior Court Department on
February 29, 2016.

A motion to dismiss was heard by Thomas A. Connors, J.


The case was submitted on briefs.
Edward J. McCormick, III, for the plaintiff.
Geoffrey P. Wermuth for the defendant.


MILKEY, J.  Plaintiff Alessendrinia Menard served as the

director of music ministries at Saint Mary's Parish in Franklin

_____

    [1] Also known as Massachusetts Catholic Self-Insurance Group,
Inc.

(parish) for eighteen years. A month before leaving her position, Menard filed a complaint with the Massachusetts Commission Against Discrimination (MCAD), alleging that the pastor at her parish had subjected her to age and gender based harassment and discrimination and had retaliated against her when she alerted defendant Archdiocese of Boston (Archdiocese). After MCAD issued a lack of probable cause finding in 2016, Menard brought the present action. She now appeals from a judgment entered in the Superior Court dismissing her claim under the so-called "ministerial exception." We affirm.

Background. 1. MCAD filing and ruling. On February 19, 2013, Menard filed a complaint with MCAD against Reverend Brian Manning and the Archdiocese. On the MCAD's preprinted, one-page form, Menard checked the boxes for "SEX," "RETALIATION," and "AGE" as the "CAUSE[S] OF DISCRIMINATION" and provided the following explanation:

> "Mrs. Menard has been subjected to harassment in the workplace at St. Mary's Church in Franklin where she has been the music director for years. Comments about her age and attitude against women have been ongoing since the arrival of Rev. Manning. After she complained to the Archdiocese more blatant and discriminatory conduct took place."

Reverend Manning and the Archdiocese vigorously denied Menard's allegations and filed a joint position statement. The statement raised several arguments, including that Menard's claim was barred by the ministerial exception based on Menard's job duties

as director of music ministries.  Menard did not file a rebuttal or at any time supplement her original filing with additional information.  In February 2016, the MCAD concluded that it lacked jurisdiction due to the First Amendment interests implicated by Menard's undisputed job duties, and noted, in any event, that she had failed to establish a prima facie claim of discrimination.

2.  The Superior Court complaint.  The three-page complaint that Menard filed against the Archdiocese included a single count for "gender and age discrimination in the workplace, harassment and a hostile work environment."[2]  The allegations included there were similar to those set forth in her administrative complaint, with only slightly more detail.  She alleged that she began serving as the director of music ministries at the parish in 1995, and that when Reverend Manning arrived there in 2009, she "began being subjected to harassment . . . , including comments made about her age and attitude against women."  According to Menard, she was "unaware of any complaints regarding the performance of her duties" prior to Reverend Manning's arrival.  Menard further alleged that when she notified the Archdiocese, she was retaliated against with

---

[2] Menard's complaint also made a passing reference to racial discrimination.  However, a subsequent filing clarified that she was not, in fact, raising a race-based discrimination claim.

further harassment, although the complaint does not specify whether such acts were at the hands of Reverend Manning or other members of the Archdiocese.

3. <u>Additional material filed.</u>  The Archdiocese filed a motion to dismiss based on several grounds, including that Menard's claim was barred by the ministerial exception. Appended to that motion were several documents, including two that related to Menard's job responsibilities.  One was Menard's employment contract, which she and the then-presiding pastor signed in 1995.  That contract outlined Menard's duties as follows:

> "a) To plan and co-ordinate all music for all Parish Liturgical Celebrations
>
> "b) To provide and lead music at four weekend Liturgies
>
> "c) To teach and conduct choir(s); Adult Choir, Children's Choir, Contemporary Choir and Teen (Youth) Choir, as interest prevails
>
> "d) To train Cantors, organize their Mass schedule
>
> "e) To provide music for Sacraments; First Communion and Confirmation; provide music for Communal Reconciliation Services (Advent and Lent)
>
> "f) To provide music for Holy Days occur[r]ing on a weekday; i.e. Thanksgiving, Christmas, Ash Wednesday, etc.
>
> "g) To provide music for all Wedding and Funeral Liturgies, at additional stipends
>
> "h) Care and responsibility of all Parish Instruments, including deciding who is capable of substitution and

playing of instruments."

The other document that related to Menard's job responsibilities was an article that Menard authored for the parish newsletter describing her work.  In it, she explained that "[m]usic choices for [Mass] Liturgies are carefully and prayerfully chosen to correspond with the readings from the Lectionary and the prayers from the Roman Missal."  Menard wrote that the "goal" of these choices "is to form reinforcement of the Holy Scriptures so that we may better understand them, and to encourage full and active participation of the assembly."[3]

4.  <u>Superior court ruling</u>.  In ruling on the Archdiocese's motion to dismiss, the judge noted that "[w]hile this matter is a Rule 12(b)(6) motion to dismiss, both parties have filed numerous exhibits relating to the parties' relationship . . . . The court considers these materials in resolution of this motion as their authenticity plainly is undisputed."  Passing over several other arguments that the Archdiocese raised, the judge concluded that the ministerial exception barred Menard's claim,

---

[3] Menard herself included a copy of her letter of resignation with her opposition to the Archdiocese's motion to dismiss.  That letter alleged that Reverend Manning's conduct forced her to seek medical treatment.  The letter also refers to a series of e-mails from Reverend Manning that Menard characterized as "demeaning and spiteful" and an attack on her "credibility, integrity, job performance and . . . musical ability."  Menard did not mention that the e-mails contained any comments related to age or gender.

and he allowed the Archdiocese's motion to dismiss.

Discussion.  1.  Reliance on documents outside of the complaint.  Menard argues that in allowing the Archdiocese's motion to dismiss, the judge improperly strayed beyond the allegations of the complaint to examine documentary material that the Archdiocese submitted.  This argument requires little discussion.  The Archdiocese submitted the two key documents at issue -- Menard's contract and her article -- not to contradict any allegations of the complaint, but to bring to the court's attention uncontested material that supported an affirmative defense.  Menard signed one of the documents and wrote the other, and their authenticity was not in doubt.  She raised no claim to the judge that she contested the documents, that it would be improper for him to rely on them, or that she needed more time to respond.  Under these circumstances, regardless of whether the judge properly considered the documents on a motion to dismiss, Menard cannot demonstrate that her "substantial rights" were "injuriously affected."  G. L. c. 231, § 119.

2.  Ministerial exception.  The First Amendment to the United States Constitution guarantees individuals the right to the free exercise of religion and prohibits the establishment of religion by the Federal government.  The ministerial exception doctrine developed to protect those rights.  As the United States Supreme Court has explained, "Since the passage of Title

VII of the Civil Rights Act of 1964 . . . , and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Employment Opportunity Comm'n, 565 U.S. 171, 188 (2012) (Hosanna-Tabor). The ministerial exception serves to prevent courts from "interfer[ing] with the internal governance of the church, [and] depriving the church of control over the selection of those who will personify its beliefs." Id.

In Williams v. Episcopal Diocese of Mass., 436 Mass. 574, 583 (2002), the Supreme Judicial Court recognized that the doctrine applied to discrimination claims raised under G. L. c. 151B.[4] Williams concerned an employment discrimination action initiated by an Episcopal priest. Id. at 574-575. The court held that where there is a "conflict between the legislative mandate of G. L. c. 151B to eliminate discrimination in the workplace and our constitutional mandate to preserve the

---

[4] The United States Supreme Court subsequently recognized the exception and clarified that it was an affirmative defense, rather than a jurisdictional bar. Hosanna-Tabor, 565 U.S. at 188, 195 n.4 (partially abrogating Williams on this point).

separation of church and State, the constitutional directive must prevail."  Id. at 583.  The Supreme Judicial Court revisited the ministerial exception in Temple Emanuel of Newton v. Massachusetts Comm'n Against Discrimination, 463 Mass. 472, 486-487 (2012), wherein the exception served to bar an employment discrimination claim raised by a teacher at a religious school.

The issue before us is whether the ministerial exception applies to Menard's position as director of music ministries. Menard argues that the exception should not bar her claim, as she "is not a minster, rabbi, priest, deacon or any person who deals with doctrine, canon law, discipline or any ministerial relationships."  However, the Supreme Court was clear in Hosanna-Tabor that "the ministerial exception is not limited to the head of a religious congregation."  565 U.S. at 191. Resisting a "rigid formula," id. at 190, for determining whether or not a job is covered under the ministerial exception, the Court in Hosanna-Tabor opted instead for a fact-intensive inquiry that considered multiple factors, including the employee's title, her training, her job duties, and her "role in conveying the Church's message and carrying out its mission." Id. at 192.[5]

---

[5] The Supreme Court recently reaffirmed its ruling in Hosanna-Tabor in a pair of cases involving two Roman Catholic

Since Hosanna-Tabor, several courts have had occasion to apply this analysis to individuals involved in the direction and playing of music for the Roman Catholic Church and other religious organizations. One of the first cases to apply Hosanna-Tabor was Cannata v. Catholic Diocese of Austin, 700 F.3d 169 (5th Cir. 2012). In Cannata, the plaintiff, a music director, played music during services and assisted with administrative tasks, but had none of the "liturgical responsibilities belonging to [his] predecessor . . . because [he] lacked the requisite education, training, and experience." Id. 170-171. The plaintiff there argued that "he merely played the piano at Mass and that his only responsibilities were keeping the books, running the sound system, and doing custodial work," id. at 177, and that "he was not ordained and he did not conduct Mass, deliver a sermon, or write the music or lyrics for the ceremony." Id. at 178. Finding "undisputed evidence . . . that music is an integral part of the celebration of Mass," id., the court held that there was enough for the ministerial

---

elementary teachers who had sought clarification on the contours of the multiple-factor inquiry laid out in Hosanna-Tabor. See Our Lady of Guadalupe Sch. v. Morrissey-Berru, U.S. Supreme Ct., Nos. 19-267 & 19-348 (July 8, 2020). In applying the ministerial exception to both cases, the Court reemphasized the lack of a rigid test, writing that "the circumstances . . . found relevant in [Hosanna-Tabor]" should not be treated as "checklist items to be assessed and weighed against each other in every case." Id., slip op. at 22. Instead, courts should "take all relevant circumstances into account." Id.

exception to bar the plaintiff's claims where there was "no genuine dispute that . . . by playing the piano during services, [the plaintiff] furthered the mission of the church and helped convey its message to the congregants." Id. at 177.

More recently, in Sterlinski v. Catholic Bishop of Chicago, 934 F.3d 568, 569, 572 (7th Cir. 2019), the Seventh Circuit Court of Appeals applied the ministerial exception to a plaintiff who had been the musical director, but was demoted to an organ player before being fired. The plaintiff argued that in his role as organist, he "robotically play[ed] the music that he was given." Id. at 569. In ruling that the ministerial exception nevertheless applied, the court noted that "[i]f the Roman Catholic Church believes that organ music is vital to its religious services, and that to advance its faith it needs the ability to select organists, who are we judges to disagree?" Id. 570. All other cases involving music directors in the Catholic Church appear to be to the same effect. See Tomic v. Catholic Diocese of Peoria, 442 F.3d 1036 (7th Cir. 2006) (director of music subject to ministerial exception); Equal Employment Opportunity Comm'n v. Roman Catholic Diocese of Raleigh, 213 F.3d 795 (4th Cir. 2000) (same). See also Curl v. Beltsville Adventist Sch., U.S. Dist. Ct., No. 15-3133 (D. Md. Aug. 15, 2016) (music teacher in Seventh Day Adventist school subject to ministerial exception).

In this case, Menard's job duties place her squarely within the ministerial exception. As implied by her title, director of music ministries, Menard's role was a substantive one. She selected and played music at all parish events, taught and conducted multiple choirs, trained the church's cantors, and organized the cantors' schedule for Mass. Far more than the rote playing of an instrument, which the court in Sterlinski found sufficient, Menard's job required her to thoughtfully select the music for each event and train others to perform it. Menard conveyed this in her own words in an article that she wrote for the parish newspaper. As noted, Menard herself explained there that "[m]usic choices for [Mass] Liturgies are carefully and prayerfully chosen . . . to encourage full and active participation of the assembly." While the record is silent as to Menard's training prior to her being hired, her job duties presuppose a significant knowledge of her faith's musical canon, and the ability to transmit that knowledge and "convey[] the Church's message" to the members of St. Mary's Parish several times a week. Hosanna-Tabor, 565 U.S. at 192. "What matters, at bottom, is what an employee does." Our Lady of Guadalupe Sch. v. Morrissey-Berru, U.S. Supreme Ct., Nos. 19-267 & 19-348, slip op. at 18 (July 8, 2020). As with elementary school teachers at a religious school, Menard's duties of "educating young people in their faith, inculcating its

teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of [her parish]." Id.

Because we conclude that the ministerial exception applies to Menard's position, she is unable plausibly to demonstrate an entitlement to relief on her employment discrimination claim.[6] Her claim was properly dismissed pursuant to Mass. R. Civ. P. 12 (b) (6).

Conclusion. We affirm the judgment dismissing Menard's claim.

So ordered.

_____

[6] Menard suggests that her complaint alleges harassment, not just discrimination, and that such claims would not be barred by the ministerial exception. In Williams, 436 Mass. at 582-583, the Supreme Judicial Court acknowledged but did not reach the question of "whether the First Amendment provides a complete barrier to a minister's complaints of conduct by church superiors that properly could be characterized as sexual harassment in the context of an employment discrimination claim." As in Williams, we need not pass on the viability of such an argument, because any allegations of harassment included in Menard's complaint are so threadbare that they are dismissible for failing to state a claim on which relief could be granted. See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (complaints must do more than rest on conclusory allegations and must plausibly suggest an entitlement to relief). See also Temple Emanuel of Newton, 463 Mass. at 487 n.10.